Richard B. BELLEW, Petitioner,

v.

Jacob B. GUNN, Warden, Respondent.

No. C-75-0512-CBR.

United States District Court,
N. D. California.

Nov. 24, 1976.

Richard B. Bellew, in pro. per.

Evelle J. Younger, Atty. Gen., Jack R. Winkler, Chief Asst. Atty. Gen., Edward P. O'Brien, Asst. Atty. Gen., Derald E. Granberg, Don Jacobson, Deputy Attys. Gen., San Francisco, Cal., for respondent.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Petitioner, paroled since March 5, 1975, filed this petition for a writ of habeas corpus attacking his convictions for violation of California Penal Code § 12021 and California Vehicle Code § 10851. Petitioner raises several grounds for relief: (1) the failure of the trial court to grant his motion for severance, (2) the procurement of eyewitness identifications under inherently unfair circumstances, (3) the failure of the trial court to advise petitioner of the consequences of admitting to prior felonies, (4) an unconstitutional search of petitioner's automobile and seizure of a weapon used as the basis for the § 12021 charge, (6) prejudicial error in the scope of cross-examination, and (7) prosecutorial misconduct.

Petitioner raised each of these issues by direct appeal to the California Court of Appeal and Supreme Court. His convictions were affirmed by the Court of Appeal in an unpublished opinion filed September 6, 1974; the California Supreme Court denied his petition for hearing on December 5, 1974. Petitioner has therefore exhausted state remedies as required by 28 U.S.C. § 2254(b).

The petition herein was filed on March 14, 1975. On January 9, 1976, the Court issued an Order of Service and an Order to Show Cause to respondent with respect to each of petitioner's claims. Respondent filed a return on May 10, 1976, and petitioner filed a traverse on June 1, 1976.

### Factual Background

The relevant facts preceding petitioner's conviction may be summarized as follows. On the night of May 7, 1972, Sandra and Jeff Davis noticed two men moving back and forth between two automobiles in the parking lot of their apartment complex. Ms. Davis telephoned the Fremont Police Department and, shortly after 11:30 P.M., Officer Lawrence of the Department responded to the call. Arriving at the complex in his police car, the officer noticed a red Chrysler traveling down the driveway to his right and a green Dodge to his left. The officer parked his vehicle in front of the Dodge and got out of his patrol car, flashlight in hand. The driver of the Dodge, subsequently identified as Forrest Tucker, jumped out of the car, pointing a .38 caliber revolver at the officer. A scuffle followed and Mr. Tucker was subdued with the assistance of a second police officer, Officer Asselin, who arrived at the scene. Mr. Tucker was arrested that evening.

At Officer Lawrence's request, Officer Asselin proceeded to check the Chrysler. As he approached the automobile, several bystanders informed him that the Chrysler's driver had climbed over an adjacent brick wall. The officers climbed over the wall and searched for the driver for about five minutes. Having failed to find him, they returned to the parking lot. Officer Asselin then looked into the Chrysler and removed a satchel from the back seat. He opened the satchel and placed it on the roof of the automobile.

As additional police officers arrived at the scene, an Officer Murray was detailed to check both automobiles. In checking the Dodge, among other things, he found in the glove compartment a photostat of a registration indicating that the car was registered to Bob Hiam Dodge in San Jose. He radioed for information regarding the car's license plates and removed them from the car. It was subsequently determined that the Dodge had been missing, without permission, from Bob Hiam Dodge's lot since May 6, 1972, and that the license plates had been removed without permission from a San Jose resident's car the night of May 7.

Next checking the Chrysler, Officer Murray discovered a registration in petitioner's name, a brown wallet containing a driver's license and other papers in the same name,

and various tools. Opening the satchel which had previously been removed from the vehicle, he found a license plate frame marked "Bob Hiam Dodge," a ring of vehicle keys, and a Bank of America money bag.

Meanwhile, Jeff Davis informed Officer Murray that the man who had fled from the Chrysler had thrown an object over the wall before he climbed over it. At least one officer briefly searched the area which Mr. Davis pointed out but, impeded by the darkness and heavy vegetation of the area, found nothing. Officer Murray returned to the area at dawn the next morning and at that time, he found a loaded .22 caliber derringer about six inches from the wall and near the place where the Chrysler had been parked.

On the night of the incident, both Jeff and Sandra Davis stated that they were unsure whether they could identify the driver of the Chrysler. On May 12, 1972, each was separately shown six photographs and asked to indicate whether they recognized any of the individuals. Neither made a positive identification, although Ms. Davis did indicate that two of the photographs—one a picture of petitioner—resembled the driver of the Chrysler.

Petitioner was located and arrested at the home of a friend of May 23, 1972. On May 24, both Mr. and Ms. Davis attended a line-up at the Fremont Police Department. They were given blank cards, asked to sign their names, and to denote by number any individual whom they could positively identify as having been present on the night of May 7. Both turned in blank cards and left the station.

After the line-up, Detective Rager of the Fremont Police Department contacted Mr. Davis at his place of employment and asked him why he had failed to make an identification. Mr. Davis noted that he believed

that he was required to make an identification only on the basis of facial structure, without reference to other physical characteristics, and was unable to identify any of the men on that basis. After Detective Rager explained that an identification on the basis of other physical characteristics was permissible, Mr. Davis positively identified Number 3, petitioner. Similarly, about an hour after she left the station, Detective Rager went to see Ms. Davis at home. He told her that he was afraid that he had intimidated her by overly emphasizing that she must be positive about her identification. She responded that she wished to identify Number 3, petitioner.

On June 30, 1976, the District Attorney of Alameda County filed an information charging him with taking and driving the green Dodge without the consent of the owner, in violation of § 10851 of the California Vehicle Code, and with having been an ex-felon in possession of a gun on or about May 7, 1972, in violation of § 12021 of the California Penal Code. A preliminary hearing was held on June 15–16, 1972, and petitioner was ordered bound over on each and every count. Over petitioner's objection, the state's motion to consolidate petitioner's trial with that of Forrest Tucker was granted on July 19, 1972.[1]

Petitioner made several pretrial motions. His motion to dismiss the indictment was denied on August 4, 1972. His motion to suppress certain evidence was denied on August 17, 1972. Finally, his motion to sever his trial from that of Tucker was argued and denied immediately prior to trial on September 28, 1972.

Petitioner was re-arraigned as to and admitted three prior felony convictions, an element of the § 12021 charge, on September 28, 1972. The two defendants then had a trial by jury. Both moved unsuccessfully

---

1. On June 6, 1972, the District Attorney of Alameda County filed an information charging Forrest S. Tucker with assault with a deadly weapon on a police officer, in violation of § 245(b) of the California Penal Code; with taking and driving the green Dodge without the consent of the owner, in violation of § 10851 of the California Vehicle Code; with possession of stolen property (a revolver), in violation of § 496 of the California Penal Code; and with having been an ex-felon in possession of a gun, in violation of § 12021 of the California Penal Code.

for a directed verdict at the close of the state's case on October 6, 1972. On October 12, 1972, the jury returned verdicts of guilty against both defendants as to each of the offenses charged. The court denied both defendants' motions for a new trial on November 3, 1972.

### Denial of Severance

█ Petitioner contends that the trial judge's failure to grant his motion for severance, requested in part due to the possibility that his co-defendant might in a separate trial offer exculpatory testimony which he would not offer in a joint trial,[2] denied him due process. He relies primarily upon *Byrd v. Wainwright*, 428 F.2d 1017 (5 Cir. 1970), in which the Court of Appeals for the Fifth Circuit enumerated five factors relevant to determining whether a severance motion was improperly denied by a state trial judge: (1) the extent to which the movant makes known his good faith desire to have the co-defendant testify, (2) the nature and significance of the projected testimony, as demonstrated by the movant to the court, (3) the likelihood that the co-defendant would testify if severance were granted, as shown by the movant to the court, (4) the timeliness of the motion and the demands of judicial economy, and (5) the likelihood that the co-defendant might plead guilty at or immediately before trial, thus prejudicing the movant. Applying the principles of *Byrd v. Wainwright*, as they have been accepted and interpreted by the Court of Appeals for the Ninth Circuit, the Court does not find that the trial judge abused his discretion in denying petitioner's severance motion.

Petitioner through his counsel did indicate to the trial judge his interest in his co-defendant's testimony. He not only offered the need for such testimony as an argument supporting his motion for severance, but also called his co-defendant to the stand during their joint trial. However, despite his apparent interest in the testimony, petitioner neither apprised the trial judge of the nature of the co-defendant's projected testimony [3] nor made any affirmative showing that Tucker would actually testify at a severed trial.[4] The Court of

2. Although petitioner presently stresses the possibility of exculpatory testimony from Tucker as the compelling justification for severance, a study of the transcripts of the proceedings relevant to the severance issue suggests that counsel for petitioner did not so isolate and emphasize this single issue prior to and at trial. In moving for severance, as in objecting to the motion for consolidation, petitioner listed the possibility of denial of such testimony as one of three potential prejudices which might result from a joint trial, and did not weigh that possibility more heavily than the others. Thus, although petitioner did raise the issue previously, he certainly suggests that it deserves greater consideration in retrospect than he did at the time of trial.

3. In the course of pretrial and trial proceedings concerning the severance issue, petitioner's counsel only once offered any indication of the content of Tucker's projected testimony. At petitioner's preliminary examination, after petitioner's counsel had suggested to the judge that petitioner desired to have Tucker testify as a witness, the discussion between court and counsel proceeded as follows:

"THE COURT: To testify? What is the offer of proof? What does Mr. Bellew expect Mr. Tucker will testify to?

"MR. SNELL: It is my understanding that he believes that Mr. Tucker will take him out of the case. I think that Mr. Tucker would not.
"THE COURT: He will offer testimony that Mr. Bellew was nowhere in the vicinity of whatever alleged crime was committed?
"MR. SNELL: That is my understanding." Transcript of Preliminary Examination, June 15–16, 1972, at 4–5.
Although petitioner's counsel did suggest in arguing both against the motion to consolidate and in favor of the motion to sever that Tucker's testimony would exonerate petitioner, this hesitant and skeptical description of the projected testimony is the only description which the record reveals.

4. When called to testify at Bellew's preliminary examination, Tucker noted that he wanted to speak to his co-defendant before he expressed an interest in testifying, and he asked the court whether his testimony could be limited to petitioner's participation in the matter. Transcript of Preliminary Examination, June 15–16, 1972, at 116–117. At that point, Tucker's counsel stated: "Judge, as his Counsel, I feel it is my duty to inform the Court that as long as I am his Counsel, I am not going to let him testify regardless of whatever opinions Mr. Tucker has about this situation." *Id.* at 117–118. Even if the Court assumed that Tucker's law-

Appeals for this Circuit has repeatedly held that "[w]hen there has been insufficient showing that the codefendant would actually testify at a severed trial, the district court has not abused its discretion by refusing to grant the motion." *United States v. Thomas*, 453 F.2d 141, 144 (9 Cir. 1971), *cert. denied*, 405 U.S. 1069, 92 S.Ct. 1516, 31 L.Ed.2d 801 (1972). *See United States v. Larios-Montes*, 500 F.2d 941, 944 (9 Cir. 1974); *United States v. Bumatay*, 480 F.2d 1012, 1013–1014 (9 Cir. 1973); *United States v. Noah*, 475 F.2d 688, 696 (9 Cir. 1973). A court has no duty to sever "where the possibility of the codefendant's testifying is merely colorable or there is no showing that it is anything more than a gleam of possibility in the defendant's eye." *Byrd v. Wainwright, supra*, 428 F.2d at 1022.

### Eye-Witness Identifications

Petitioner contends that the process through which two in-court identifications were ultimately obtained was so inherently suggestive as to constitute a denial of due process. Petitioner further suggests that the absence of counsel at the actual moment the out-of-court identifications were made deprived him of his Sixth and Fourteenth Amendment rights. Applying the principles set forth by the United States Supreme Court in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Court feels constrained to disagree. While the pretrial identification procedures utilized in petitioner's case may in some respects have fallen short of the ideal, they cannot be said to be constitutionally infirm.

Relying on *People v. Williams*, 3 Cal.3d 853, 92 Cal.Rptr. 6, 478 P.2d 942 (1971), petitioner contends that the right to counsel "extends not only to the conduct of the line-up itself but also to [the] process by which the identification is made immediately thereafter." Petition at 30–31. Pointing

to the absence of counsel on May 24, 1972, the day on which Detective Rager visited the Davises independently and obtained their positive identifications, petitioner contends that he was thereby deprived of his right to effectively cross-examine the two identification witnesses.

In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Supreme Court rejected an analogous claim, limiting the right to counsel during pre-trial identification procedures to the post-indictment phase of the investigation. The court in *Kirby* unequivocally refused to "import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings." 406 U.S. at 690, 92 S.Ct. at 1882.

On May 24, the day on which the Davises made their positive out-of-court identifications, formal proceedings against petitioner had not yet been initiated. The absence of counsel is therefore constitutionally insignificant. To the extent that it holds otherwise, *People v. Williams, supra*, was effectively overruled by the Supreme Court's holding in the *Kirby* case, decided one year later.

While this Court cannot condone the practice of following up an inconclusive public line-up with a private visit designed to elicit more conclusive statements from the witnesses, the absence of counsel during such a visit cannot be said to render any statements obtained inadmissible. In cross-examining Detective Rager, petitioner's counsel had ample opportunity to question the officer concerning his follow-up conversations with the Davises and to suggest any improprieties which may have occurred. As *Kirby* makes clear, the Constitution requires no more.

The Court turns now to petitioner's contention that the various pretrial identification procedures were cumulatively so "inherently suggestive" as to deny him due process of law. In investigating the events

---

yer's prohibitive statement referred only to the suggestion that Tucker might testify in a joint

trial, the record is devoid of any indication that Tucker would testify in a severed trial.

which transpired on May 7, 1972, the police utilized a photographic display as well as an actual line-up.

In *Stovall v. Denno, supra,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 the Supreme Court held that an in-court identification must be excluded if it results from a line-up which is "unnecessarily suggestive and conducive to irreparable mistaken identification." 388 U.S. at 302, 87 S.Ct. at 1972. The Court added that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." 388 U.S. at 302, 87 S.Ct. at 1972.

Restating the *Stovall* test in a case involving a photographic line-up, the Supreme Court in *Simmons v. United States, supra,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, stated that "convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside * * * only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

■ As the Supreme Court pointed out in *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), "It is the likelihood of misidentification which violates a defendant's right to due process." The suggestive character of any given procedure is relevant only insofar as it renders misidentification likely. It is for this reason that challenges to pretrial identification procedures must be evaluated in light of all the surrounding circumstances. *McNeary v. Stone,* 482 F.2d 804 (9 Cir. 1973), *cert. denied,* 414 U.S. 1071, 94 S.Ct. 584, 38 L.Ed.2d 478 (1973). In this case a thorough examination of the procedures used fails to convince the Court that the identification of petitioner was probably erroneous.

■ At the outset the Court notes that petitioner does not contend that the photographic display was itself inherently suggestive. There is no evidence that petitioner's photograph stood out in the display, or

that the officer who exhibited the photographs singled out petitioner in any way. Indeed, Mr. Davis identified none of the photographs when he viewed them on May 12, 1972, while Ms. Davis selected two of the pictures, one of them petitioner's.

At the line-up conducted on May 24, 1972, petitioner was the only individual present whose photograph had previously been displayed to the eye-witnesses. While it might have been preferable to include in the line-up the other individual whose photograph Ms. Davis had selected, the failure to do so cannot be said to have rendered the subsequent identification of petitioner inevitable. As the Court of Appeals for the Seventh Circuit stated in *United States v. Cox,* 428 F.2d 683, 686 (7 Cir. 1970):

"* * * [C]omplete insulation of identification procedures from all risk of error or incorrect suggestion is impossible. * * * A flawed procedure, however, does not require suppression in every instance."

Petitioner strives to liken the pretrial procedures utilized in his case to those held unconstitutional by the United States Supreme Court in *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968). The Court, however, finds the analogy unconvincing. In *Foster* the police exhibited to a robbery victim three individuals, two of them seven inches shorter than the suspect. When the witness was unable to make a positive identification, based upon an already suggestive line-up, the police secluded the witness with the suspect in a one-on-one show-up, thereby singling out the suspect still further. When the witness was still unable to muster an identification, the police arranged yet another line-up, at which the suspect was the only individual previously displayed. Admission at trial of the "positive" identification ultimately elicited from the witness was held unconstitutional by the Court for obvious reasons.

The mere fact that petitioner was the only individual to appear in both the photographic display and the line-up does not suffice to bring this case within the *Foster* holding, since the procedure in no wise ren-

dered identification of petitioner inevitable. Tellingly, Mr. Davis ultimately based his identification upon physical build rather than facial characteristics. Since the photographs displayed on May 12, 1972, were facial rather than full-body photographs, none of which Mr. Davis was able to recognize, the appearance of petitioner in both the photo and live line-ups is without relevance.

■ Petitioner apparently attaches great significance to the failure of the eye-witnesses to make a positive identification at either the live or photographic line-up. These facts, brought out on numerous occasions at trial by defense counsel, were for the jury to evaluate. They bear no relevance to the constitutionality of the procedures used. Faced with similar facts, the Court of Appeals for the Ninth Circuit stated in *McNeary v. Stone, supra* :

> "The fact that [the witness] picked out three other persons [than defendant] as the robbers of his bar * * * does not go to the propriety of the identification procedures, but was for the jury to evaluate in assessing [the witness's] testimony." 482 F.2d at 806.

Similarly, the fact that Detective Rager followed up the inconclusive line-up with private conversations with the Davises does not, in itself, support an inference of impermissible suggestiveness. Like the witnesses' failure to positively identify petitioner during the actual line-up, the follow-up visits were facts for the jury to evaluate in weighing the testimony of the two eye-witnesses.

There is, in any event, no indication that the officer suggested petitioner as a suspect during his follow-up visits with the Davises. Mr. Davis stated unequivocally at trial that he recognized petitioner at once during the line-up and was merely confused as to the acceptable criteria upon which he could base his identification. Ms. Davis stated that she too recognized petitioner at the line-up and immediately thereafter regretted her failure to make a positive identifica-

tion. The officer's follow-up visits do not, in themselves, warrant a finding of "unnecessary" or "impermissible" suggestiveness, nor does the failure of the witnesses to identify petitioner at the actual line-up support a conclusion that their subsequent identifications were probably erroneous.

### Plea to Prior Convictions

Petitioner alleges that the trial court failed to adequately advise him of his rights when, prior to trial, he entered a plea of guilty to three prior felony convictions enumerated in the Information. Specifically, petitioner contends that the trial court's failure to advise him that his "term of imprisonment would be enhanced by said admissions" denied him a fair trial and so deprived him of his Fifth and Fourteenth Amendment rights. Petition at 32. For the reasons set forth below, the Court finds no merit in petitioner's claim.

In order to establish a violation of California Penal Code § 12021, possession of a concealable firearm by a former felon, the prosecution had to prove that petitioner had, in fact, been previously convicted of one or more felonies. Petitioner's "plea" to the prior convictions served to establish this element of the offense before trial, thereby removing the issue of petitioner's status as an ex-felon from the jury's consideration.[5]

■ Petitioner's pretrial admission of prior convictions more nearly resembled a stipulation of fact than a true "plea" to an offense immediately charged. The ultimate issue of guilt was still before the jury, hence the elaborate warnings mandated by *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and *In re Tahl*, 1 Cal.3d 122, 81 Cal.Rptr. 577, 460 P.2d 449 (1969), were not here required.

Petitioner cites *Wright v. Craven*, 325 F.Supp. 1253 (N.D.Cal.1971), aff'd, 461 F.2d 1109 (9 Cir. 1972), as authority for the proposition that "protective measures similar to those imposed on the acceptance of a guilty plea are constitutionally required" when a

---

5. The record suggests that petitioner fully understood this consequence of his plea and chose to admit the prior convictions as a matter of trial strategy. Trial transcript at 11–12.

criminal defendant admits prior convictions. Petition at 34. However, *Wright* is inapposite insofar as it involved an application of California Penal Code § 644, the state's habitual criminal statute.

In *Wright* the defendant's admission of prior felony convictions had the effect of subjecting him to an automatic life sentence upon conviction of the principal offense. Since the consequences of the admission in *Wright* were grave, immediate, and inevitable, the Court held that "an admission of prior convictions *in the context of California's habitual criminal statute* is the functional equivalent of a plea of guilty to an independent criminal charge." 325 F.Supp. at 1257 (emphasis supplied).

Petitioner was not, nor could he have been, sentenced under the habitual criminal statute. California Penal Code § 644 requires an adjudgment of habitual criminality and imprisonment for life in the case of a defendant convicted of certain enumerated felonies, who has previously been convicted of the requisite number of prior felonies. Neither of the offenses with which petitioner was charged is among the felonies enumerated in California Penal Code § 644, hence petitioner could not, by admitting prior convictions, have subjected himself to the operation of the habitual criminal statute.[6]

Aside from withdrawing a single issue from the jury's consideration, petitioner's plea had no grave or inevitable consequences, as was the case in *Wright*. Seeking to bring himself within the *Wright* holding, petitioner argues that he should have been told that his term of imprisonment would be "enhanced" by his plea. In fact, there is no indication that petitioner's sentence *was* so enhanced by the admission, nor was such an enhancement inevitable under the circumstances.

This Court is unwilling to extend *Wright* to a situation in which an admission of prior convictions serves only to establish a single element of the offense charged. Such an extension would be tantamount to a holding that the "*Boykin-Tahl*" warnings must be given whenever a defendant stipulates to a fact which establishes an element of the offense.

Insofar as a fact stipulation does not, like a plea of guilty, result automatically in grave consequences for the pleader, the Court finds such an extension of *Wright* to be unwarranted. When a defendant, as a matter of strategy, admits an element of the charged offense prior to trial, no elaborate warnings are constitutionally mandated.

### Fourth Amendment Claims

Petitioner contends that the admission at trial of items seized from his automobile in the course of a warrantless search violated his Fourth and Fourteenth Amendment rights. In support of his claim, petitioner argues that the police lacked probable cause to initiate the search and, in any case, had ample time in which to obtain a warrant. In light of the Supreme Court's recent decision in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), this Court concludes that it is without authority to review petitioner's Fourth Amendment claim.

Petitioner first moved to suppress the fruits of the automobile search prior to trial. At a preliminary hearing held pursuant to California Penal Code § 1538.5 the legality of the search was upheld. At trial petitioner renewed his efforts to exclude evidence seized during the search. On appeal petitioner's Fourth Amendment claim, ably briefed on both sides, was rejected by the California Court of Appeal. The California Supreme Court subsequently denied a Petition for Hearing in which petitioner reiterated his argument that the search of his automobile had been unlawful.

---

**6.** The Court notes that two years after *Wright v. Craven, supra,* 325 F.Supp. 1253, the California Supreme Court held in *In re Yurko,* 10 Cal.3d 857, 112 Cal.Rptr. 513, 519 P.2d 561 (1974), that the so-called "*Boykin-Tahl*" warnings must accompany a plea to prior convictions. Insofar as *In re Yurko,* like *Wright,* involved an application of California's habitual criminal statute, it is also distinguishable from the case at bar.

In light of the foregoing, the Court finds that petitioner was afforded "an opportunity for full and fair litigation" of his Fourth Amendment claim within the meaning of *Stone v. Powell, supra*, 96 S.Ct. at 3052. That decision squarely holds that "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 96 S.Ct. at 3052 (footnotes omitted).

For the reasons cited above, the Court is without authority to review petitioner's additional claim that the introduction at trial of a derringer recovered during a second warrantless search deprived him of his Fourth and Fourteenth Amendment rights.

### Impeachment of William Stabler

Petitioner contends that the prosecution's impeachment of a key defense witness by reference to charges pending against him was so improper as to deny petitioner a fair trial. Applying the principles set forth in *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1973), and *Hughes v. United States*, 427 F.2d 66 (9 Cir. 1970), the Court concludes that petitioner's contention is without merit.

At trial petitioner called two witnesses who testified that petitioner was with them in San Jose on the night that the events alleged in the Information took place. Petitioner's next witness, William Stabler, gave testimony which, if credited, tended to exonerate petitioner from any wrongdoing. In essence, Stabler testified that it was he, rather than petitioner, who committed the acts alleged in the Information.

On cross-examination, the prosecution properly impeached Stabler by questioning him concerning his prior felony convictions. Initially Stabler admitted four such prior convictions. Subsequently he admitted six.

Over the strenuous objections of defense counsel, the prosecution next sought to question Stabler concerning charges then pending against him. During a colloquy held outside the jury's presence, Stabler enumerated more than a dozen charges then outstanding against him in various California counties.

Seeking to justify a line of questioning designed to bring the pendency of charges against Stabler to the jury's attention, the prosecution asserted that this evidence should be admitted to show possible motive or bias on the part of the witness. According to the prosecution's theory, Stabler knew he faced an inevitable and lengthy prison term and therefore had very little, if anything, to lose by accepting blame for a crime actually committed by his friend. The prosecution sought to reveal the number and severity of the charges outstanding against Stabler in an effort to counter the commonsense inference that overtly self-incriminating testimony must be true.

For the limited purpose of showing motive or bias, the trial court then allowed the prosecution to question Stabler concerning pending felony charges. In the jury's presence, Stabler admitted that "several" charges were then outstanding against him. Trial Transcript at 764.

Unlike evidence of prior convictions, evidence of pending criminal charges is not admissible for the broad purpose of attacking the credibility of a witness. California Evidence Code §§ 787–788. Evidence that a witness has been arrested or indicted falls within the general evidentiary proscription barring use of specific instances of conduct for purposes of impeachment.

Where the pendency of criminal charges may serve to bias a witness's testimony, however, the evidence is admissible for the narrow purpose of suggesting such bias. *Alford v. United States, supra*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; *Davis v. Alaska, supra*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347; *Hughes v. United States, supra*, 427 F.2d 66.

In *Alford v. United States*, the defense sought unsuccessfully to introduce evidence that a key prosecution witness was, at the time of trial, in the custody of federal authorities. The trial court excluded the evidence on the theory that a witness may not

be impeached by proof of pending charges. In reversing the conviction, the Supreme Court stated:

> "The purpose obviously was not, as the trial court seemed to think, to discredit the witness by showing that he was charged with crime, but to show by such facts as proper cross-examination might develop, that his testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States * * *." 282 U.S. at 693, 51 S.Ct. at 220.

Similarly, in *Davis v. Alaska*, the Supreme Court concluded that evidence of a key prosecution witness's probationary status was admissible to show possible motive for overzealous cooperation with the government. Although the defense theory of bias in *Davis* was purely speculative, "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony * * *." 415 U.S. at 317, 94 S.Ct. at 1111.

In *Hughes v. United States, supra,* the defense sought to introduce evidence that an informant who gave incriminating testimony at trial had himself been indicted prior to trial. The court held it error to have denied defendant an opportunity to present evidence which could have supported an inference of bias.

> " * * * [T]he defense should always have the opportunity to show by way of cross-examination or otherwise that the actions of a government informer may have been impelled by an expectation of leniency in his own pending prosecution or sentence. [Citations omitted.]" 427 F.2d at 68.

■ Although the pendency of charges in this case supplied the witness with a possible motive for giving testimony tending to exculpate, rather than inculpate, the accused, the principle followed in *Alford, Davis,* and *Hughes* remains applicable. Where evidence of pending prosecution may support an inference of motive or bias, the evidence is admissible for the limited purpose of suggesting such motive or bias. The Court therefore concludes that the trial judge properly permitted the prosecution to question William Stabler concerning the charges then outstanding against him.

*Prosecutorial Misconduct*

Petitioner lastly alleges that the prosecution was guilty at trial of "prejudicial misconduct so severe as to deny petitioner a fair trial" within the meaning of the Fourteenth Amendment. Petition at 6. Upon a thorough review of the record below, the Court concludes that the prosecutorial improprieties alleged did not amount to a deprivation of due process rights.

In addition to the allegedly improper references to charges pending against William Stabler, discussed *supra,* petitioner cites five specific instances of prosecutorial misconduct.

■ Most serious is petitioner's allegation that the prosecutor, in his cross-examination of William Stabler, pursued a line of questioning designed to reveal to the jury the petitioner's status as a former felon. Presumably, petitioner's decision to plead to three prior felonies and to give no testimony in his own defense were motivated primarily by a desire to keep evidence of prior convictions from the jury. Insofar as petitioner stipulated to the priors and refrained from testifying, evidence of his criminal record was neither relevant to establish guilt nor proper for purposes of impeachment.

In his cross-examination of William Stabler, the prosecution nonetheless pursued a line of questioning heavy with the innuendo that Stabler had befriended petitioner while the two were in prison together. For instance, the prosecutor asked Stabler: "When you first met Mr. Bellew, you were in state prison at that time, weren't you?" Trial Transcript at 761. Although the question went unanswered, the inference that petitioner had himself served time was virtually inescapable.

In light of the extensive colloquy engaged in by counsel at the time of petition-

er's pretrial "plea" to prior convictions, the line of questioning complained of cannot be ascribed to mere inadvertence. The consequences of petitioner's plea were thoroughly explored and the trial court all but ruled that evidence of petitioner's prior convictions would be inadmissible.

■ This Court cannot condemn too strongly a seemingly deliberate effort on the part of the prosecutor to reveal a highly prejudicial piece of information which petitioner in good faith bargained to conceal from the jury. Nonetheless, in light of the overwhelming circumstantial evidence tying petitioner to the offenses charged and the jury's obvious failure to credit the testimony of Stabler and petitioner's two alibi witnesses, the Court finds that this instance of misconduct was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Petitioner contends that the prosecutor's juxtaposition of cross-examination questions concerning William Stabler's prior convictions with questions relating to charges pending against Stabler "belied any serious effort to probe motive, and revealed simply an attempt to attack the witness' character". Petition at 73.

Insofar as Stabler was properly impeached by proof of six prior convictions, the Court questions whether proof of pending charges in fact impaired Stabler's credibility further in the eyes of the jury. In any event, the trial court responded to a timely defense objection with the following admonition:

"[T]he jury will understand that any charges which are [pending] against [Stabler], he is presumed to be innocent. [Sic.] They are merely charges against him. The only purpose would be the question of motive in connection with this case and for no other purpose." Trial Transcript at 770.

Petitioner characterizes as improper the prosecutor's use of such phrases as "stiff charges" and "riding the heat" during the cross-examination of William Stabler. While the language used in these instances may arguably have been ill-chosen, the trial court promptly instructed the prosecutor on both occasions to reframe his questions, thereby minimizing any prejudice. Similarly, with regard to the prosecutor's assertion that "the jury has a right to know why [Stabler] is testifying as he is", the trial judge promptly instructed the jury to disregard the statement. Trial Transcript at 727.

■ In light of the foregoing, the Court concludes that any misconduct which occurred in the course of petitioner's trial did not approach constitutional dimension. As the Court of Appeals for the Ninth Circuit concluded in *United States v. Polizzi*, 500 F.2d 856 (9 Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975):

"* * * [D]uring an extensive and fiercely contested trial, we cannot realistically expect perfection. [Citations omitted.] Upon hindsight, there were things said by the prosecution which would have been better unsaid. But nothing said or done deprived appellants of a fair trial." 500 F.2d at 892.

Therefore, IT IS HEREBY ORDERED that the petition for a writ of habeas corpus is denied.