[Crim. No. 22363. First Dist., Div. Four. Dec. 23, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY ST. GERMAIN, Defendant and Appellant.

508

**COUNSEL**

Lorne H. Parker, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Linda

Ludlow and Charles J. James, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POCHÉ, J.—Gregory St. Germain appeals from the entry of a judgment of conviction after a jury found him guilty of grand theft (Pen. Code, § 487, subd. 1),[1] receiving stolen property (§ 496, subd. 1), and robbery (§ 211), and he admitted that he had served a prior prison term within the meaning of section 667.5, subdivision (b). We affirm.

*Facts*

*Prosecution's Case*

Ms. Maruja Smith, who resided in Willemstad, Curaçao, and Mr. Jacques Kowsoleea, a resident of the Netherlands, came to San Francisco in March of 1980 for a vacation. On March 16, the couple visited a friend, Coco, and met appellant. Appellant drove the four of them to the San Francisco home of Stella Gregg Meyer, a friend of Coco's. After eating, Meyer and Coco left the house to pick up Smith's dog and were gone for a few hours. After they returned, the group drove to a restaurant at Market and Noe Streets, in San Francisco. Ms. Smith left, in appellant's car, her leather pouch which contained her passport, Kowsoleea's passport, about $1,000 in cash, airplane tickets to Amsterdam, a camera, various items of jewelry and other personal belongings. According to Smith, appellant knew that she had left her pouch in his car.

While in the restaurant, appellant quarreled with Meyer and left. He then drove away before Smith could retrieve her pouch from the car. Smith reported the incident to the police that evening.

From the license plate number provided by Smith, the police traced appellant's address in Union City. San Francisco Police Officers Marweg and Hamilton went to appellant's apartment and were admitted by appellant's wife. After advisement of his rights, appellant agreed to speak with the officers and gave them the pouch. Although appellant stated that the pouch was in the same condition as when he found it in the car, the officers noticed that it did not contain either money or airplane tickets. When the police asked him whether he was sure that the pouch was complete, appellant told his wife to "Give them the rest of the stuff." She then gave the officers some jewelry, a camera, and a

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

jewelry box. Appellant then gave the officers a plastic bag containing foreign currency and coins. He was arrested.[2]

Stella Gregg Meyer testified that when Coco and she returned to her house, Smith and Kowsoleea had a fight and left with appellant in his car. Meyer followed them outside and saw that Smith had her bracelet which Smith gave back to her. When she returned, she noticed that her turntable had been moved from the bookshelf to the floor and that the cord to the television was wrapped around it. She then found that her dark mink coat, two small Bang Olufsen speakers, a Sony cassette player and some jewelry were missing. About an hour and a half later she went to the Cafe Flora where she found Smith, Kowsoleea and appellant sitting at an outside table. She accused them of stealing her things and said that she wanted to look at appellant's car. Appellant took her to the car where she noticed that Smith's pouch was on the floor by the back seat. She asked for the trunk key. Appellant responded that he did not have one and he refused her request to try his keys. They returned to the restaurant where Kowsoleea suggested that she call the police. She refused and left. As she got into her car, she saw appellant driving away and Smith running after him motioning for him to stop. Several days later she contacted the police and reported the items missing from her house because Smith requested her to do so.

On March 16, at about 1:10 a.m., Mary Hills and Margaret Middleton were walking on Pacific Avenue in San Francisco. Both women carried a purse and a box with clothing between them. A man approached them and asked, "Do you have the time?" Middleton told him the time, at which point the man knocked the box so that it fell to the ground and grabbed both of their purses. Hills held on to her purse strap and was dragged down the street. The strap on Middleton's purse broke, causing the purse to fall to the ground but she retrieved it. Hills finally let go of her purse and the man ran down to the corner where he entered the passenger side of an automobile and left.

Hills testified that she was 50 percent sure that appellant was the person who took her purse. Middleton testified that she was 80 percent sure that appellant was the perpetrator but admitted that she had some "doubt" in her mind about the identification.

Hills' checkbook and credit cards were found in Smith's pouch at appellant's apartment on March 19.

On May 16, at about 7:30 p.m., Jean Marcar was walking along Dolores Street near 19th Street in San Francisco carrying a green airline-bag containing her checkbook, a wallet with credit cards and about $32 in cash, and some

---

[2] Also found in the house were two Bang Olufsen speakers, a Sony stereo cassette player and a mink coat.

food. A man walked up to her, pushed her shoulder back, pulled the bag off her shoulder and then ran up the street and entered a car. Marcar got the license plate number which matched that of appellant's car. Ms. Marcar identified appellant as the perpetrator at trial, although not "positively."

Jean Marcar's credit cards were found on the evening of May 16 in the possession of Regina Lewis at the Budget Hotel on 7th Street in San Francisco.

*Defense Case*

Appellant testified that in the late afternoon of March 14, he drove to Coco's apartment in San Francisco to buy marijuana. There he met Smith and Kowsoleea. Coco asked to borrow some money so that he could buy some Persian heroin. Appellant gave him $100, with which Coco purchased two-tenths of a gram of heroin, and the four of them shared it. Coco promised appellant that he would return the money to him. Appellant spent the night and the next day with Coco. On March 16, they went to Stella Meyer's house around noon. According to appellant, Coco and Smith acknowledged their debt to him and left the house to obtain money to repay him. While they were gone, Kowsoleea told appellant that Coco and Meyer had "burned [him] before" and that he would put some things from the house in the trunk of appellant's car as security. Kowsoleea put two speakers, a tape deck and earphones in the trunk of appellant's car and appellant added a black coat and another tape deck. Smith gave appellant a silver ring belonging to Meyer and said that he should give it to his wife.

Coco and Meyer returned about 7 p.m., with their eyes "pinned back," meaning that they had used heroin. They quarreled about the money and then Smith, Kowsoleea and appellant got into appellant's car, and drove to a restaurant on Noe and Market. There they met a friend of Kowsoleea's and proceeded to his house where they ingested cocaine. The four of them left the house and returned to the restaurant about an hour later. Meyer arrived about 15 minutes later and asked for her "stuff." She asked for the keys to appellant's trunk, which he said he did not have. He opened the car for her and he saw Smith's bag, which he testified that he thought was Meyer's "bag that they put on their head . . . ." They returned to the restaurant and after further quarreling, he left. On the way home he noticed the bag, but thought to himself that he would return it to Kowsoleea in "three days" when he got his money back. He testified that he did not hear anyone calling him as he drove away, and that he arrived home around midnight.

His reason for taking Meyer's property was to secure the debt.

With respect to the Marcar incident, appellant presented an alibi defense. He testified that on May 16, he drove to San Francisco about 2 or 3 p.m. He

parked his car on Ellis and Hyde Streets and walked along Geary or Ellis Street where he hoped to buy codeine for his back problem. There he met a woman named Virginia or Regina Lewis who offered to get him some codeine if he would let her use his car. They got in his car and he drove them to the corner of Eddy and Mason where he gave her $5 and she purchased him two codeine pills. On the return trip he was in an accident with a Muni bus.[3] After the accident, his back began to bother him so the woman promised to give him 10 codeine pills if he would lend her the car. He agreed and they proceeded to a hotel room on Ellis and Hyde Streets. The woman then told him that she was going to use the car to "rob somebody for four's [codeine]." He gave the woman the keys to the car and waited in the hotel room for her to return. She returned about four hours later, gave him seven pills, and he went home.

He testified that he had no idea about the robbery of Marcar until he was arrested on that charge on June 5.

### The Verdicts

The prosecution filed two informations with respect to these facts, and the informations were consolidated for trial. For purposes of clarity, we delineate the crimes charged by information and victim, and designate the respective verdict by the jury:

*Information No. 101947*

Count I, grand theft; victims, Smith and Kowsoleea; guilty.

Count II, receiving stolen property; victim, Meyer; not guilty.

Count III, grand theft; victim, Meyer; not guilty.

Count IV, robbery; victim, Hills; not guilty.

Count V, attempted robbery; victim, Middleton; not guilty.

Count VI, receiving stolen property; victim, Hills; guilty.

*Information No. 102578*

Count I, robbery; victim, Marcar; guilty.

### Discussion

*The trial court did not abuse its discretion in granting the motion to consolidate the informations.*

---

[3]The fact of the accident was corroborated by the Muni bus driver who testified that his bus was in an accident with appellant's car on Market Street between 7th and 8th Streets at about 4:45 p.m.

██ Appellant contends that the trial court abused its discretion in granting the People's motion to consolidate two informations and in denying his motion to sever.

Section 954 provides that an accusatory pleading may charge "two or more different offenses connected together in their commission," and that if "two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

This section permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantive importance in their commission. (*People* v. *Scott* (1944) 24 Cal.2d 774, 778-779 [151 P.2d 517].) Joinder is permissible even where the offenses "were committed at different times and places and against different victims" so long as there is a "common element of substantial importance in their commission." (*People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679], cert. den., 361 U.S. 925 [4 L.Ed.2d 241, 80 S.Ct. 296], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; see also, *People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752].) A trial court does not abuse its discretion in permitting joinder of offenses which contain, as a common element of substantial importance, the intent to feloniously obtain property. (*People* v. *Chessman, supra,* 52 Cal.2d at p. 492.)

Here, the two informations met all the criteria necessary for joinder. Information No. 101947 charged four offenses which shared the common element of intent to feloniously obtain property: count I, theft; count III, theft; count IV, robbery; and count V, attempted robbery. Count II and count VI were alternate charges involving possession of the same stolen property from the same victims. Information No. 102578 charged one offense, robbery, which similarly contained the common element of intent to feloniously obtain property.

Appellant urges that he was prejudiced by the joinder of the purse snatching and the theft offenses, but he fails to sustain his burden of showing prejudice. Instead it is apparent that the joinder worked to his benefit: the jury deadlocked as to counts II and III and acquitted appellant as to counts IV and V in information No. 101947.

*The trial court erred in admitting the former testimony of Smith.*

██ Over defense objection, the People were allowed to introduce into evidence portions of the transcripts of Smith's and Kowsoleea's testimony at

the preliminary hearing. At the preliminary hearing, Smith testified that although her "home" was in Willemstad, Curaçao, she had a "green card" which meant that she was a permanent resident of the United States. (8 U.S.C. § 1304 (a); 8 C.F.R. § 264.1 (b).)[4] Kowsoleea testified he was a resident of Holland visiting the United States.

Prior testimony may be introduced if the declarant is unavailable as a witness. (Evid. Code, § 1291.) Unavailability may be established by showing that the declarant is "[a]bsent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The burden of proof of unavailability is on the proponent of the evidence. (See *People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 696 [83 Cal.Rptr. 764]; com. to Evid. Code, § 405.)

The trial court found that the prosecution had established unavailability of each witness by the introduction of the following evidence.

On August 8, a process server with the district attorney's office mailed letters, by registered mail, to Smith and Kowsoleea at their respective home addresses: Smith in Willemstad, Curaçao, and Kowsoleea in Amsterdam, Holland. Therein, the district attorney requested them to call collect upon receipt of the letter and inform her whether or not they would be able to come to San Francisco to testify at the trial set for August 18.[5] Next, an investigative police officer stated that while he was in the district attorney's office on August 15, he answered a long distance collect telephone call from Smith and Kowsoleea, whose voices he recognized from previous contact with them. During the conversation, they stated that they had left San Francisco for New York in mid-April and had returned to Holland on May 8, and that although they had received the district attorney's letter on August 13, they were unable to come to San Francisco because: they had just purchased a home and acquired several animals; that there had been a recent death in the family; and finally, because they were suffering "financial hardship" resulting from the incident in San Francisco. The officer summed up their response: it was "totally out of the question, they could not do it due to numerous difficulties they were encountering at the time."

---

[4] During cross-examination, Smith stated she would be willing to return to San Francisco to testify at trial if her expenses were paid.

[5] Specifically the letters stated: "The trial in this case is scheduled for August 18, 1980 in San Francisco. We have been trying to reach you by telephone for some time both in Curaçao and in Amsterdam. We must determine if you are available to come to San Francisco or if you are unable to come. If you are unable to appear, the Court will allow us to use your testimony from the earlier hearing. It is important that you call me. Please call *collect* to me at (415) 553-1864 or call Inspector Marweg at (415) 553-1351. Please call as soon as you receive this letter. [¶] Many thanks." (Italics in original.)

In the case at hand the prosecution did not exercise due diligence with respect to Smith. The *sine qua non* completely missing from the proof adduced by respondent was evidence of an attempt "to procure his attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The prosecutor had available the remedy of a subpoena to be issued by the federal courts requiring the appearance as a witness before a "body designated by it"—here the superior court jury—"of a national or resident of the United States who is in a foreign country. . . ." (28 U.S.C. § 1783.)[6]

Although the subpoena in such a situation issues from the court of the United States rather than the superior court it is nevertheless within the definition of "*the* court's process" contained in Evidence Code section 240, subdivision (a)(5), just as is a subpoena issued by a sister state under the Uniform Act to Secure Attendance of Witnesses From Without a State in Criminal Proceedings. (See *People* v. *Nieto* (1968) 268 Cal.App.2d 231, 235-240 [73 Cal.Rptr. 844]; *People* v. *Joines* (1970) 11 Cal.App.3d 259, 266-267 [89 Cal.Rptr. 661]; *In re Terry* (1971) 4 Cal.3d 911, 930-931 [95 Cal.Rptr. 31, 484 P.2d 1375]; *People* v. *Masters* (1982) 134 Cal.App.3d 509, 523 [185 Cal.Rptr. 134].)

Accordingly, we hold that failure to attempt to secure the presence of Smith through the procedure of 28 U.S.C. section 1783, rendered her former testimony inadmissible.

The same cannot be said with respect to Kowsoleea, a resident of Holland. Evidence Code section 240, subdivision (a)(5), simply has no application to him for there was no "court process" which could compel the attendance of a nonresident.

In cases where there exists no process with the power to "compel" attendance, Evidence Code section 240, subdivision (a)(4), defines unavailability

---

[6]28 U.S.C. section 1783 provides: "(a) A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified document or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner. [¶] (b) The subpoena shall designate the time and place for the appearance or for the production of the document or other thing. Service of the subpoena and any order to show cause, rule, judgment, or decree authorized by this section or by section 1784 of this title shall be effected in accordance with the provisions of the Federal Rules of Civil Procedure relating to service of process on a person in a foreign country. The person serving the subpoena shall tender to the person to whom the subpoena is addressed his estimated necessary travel and attendance expenses, the amount of which shall be determined by the court and stated in the order directing the issuance of the subpoena."

as: "the declarant is: [a]bsent from the hearing and the court is unable to compel his attendance by its process." The prosecutor met his burden with respect to Kowsoleea by showing that the witness was a nonresident of the United States, a citizen of another country and that "[w]e have no treaty provisions nor any compact with the foreign country." Nothing more was required either by the Evidence Code or the Sixth Amendment.[7] (*Mancusi* v. *Stubbs* (1972) 408 U.S. 204, 211-212 [33 L.Ed.2d 293, 300-301, 92 S.Ct. 2308]; *People* v. *Ware* (1978) 78 Cal.App.3d 822, 833 [144 Cal.Rptr. 354].)

The error in admitting the prior testimony of Smith not only was error in the sense that it was inadmissible hearsay but it also violated appellant's right to confront the witnesses against him. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; § 686.) "A witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." (*Barber* v. *Page* (1968) 390 U.S. 719, 724-725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318].) The Evidence Code "is in harmony" with this Sixth Amendment requirement. (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) Thus, the error in admitting the prior testimony of Smith was of constitutional dimension. (*In re Terry, supra,* 4 Cal.3d at p. 931.)

The prior testimony was directed to grand theft of property belonging to Smith and Kowsoleea, contained in a bag belonging to Smith. Kowsoleea testified that appellant drove off with the bag in his car and that he had no permission to use Kowsoleea's possessions. In addition, Meyer testified that she saw Smith's bag in appellant's car when he drove away from the restaurant. Since the erroneously admitted former testimony of Smith was corroborative only of otherwise well established facts, we find the error to be harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

*The in-court identifications.*

Appellant contends that the in-court identifications by victims Hills, Middleton and Marcar were the product of impermissibly suggestive pretrial procedures.

Appellant was acquitted of robbery of Hills (count IV) and attempted robbery of Middleton (count V), but was found guilty of receiving stolen property

---

[7]Neither at trial nor here did appellant suggest that with respect to Kowsoleea the prosecution's alleged lack of due diligence began before August 8, 1980. We therefore have no occasion, nor did the trial court, to address the question of whether the prosecution's duty to use such diligence began before that day.

belonging to Hills (count VI). Assuming for purposes of argument that Hills' and Middleton's in-court identifications were the product of impermissibly suggestive pretrial identification procedures, the erroneous admission of their identification testimony was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

■ In order to prove the offense of receiving stolen property, the People must show: (1) that the property was stolen; (2) that the accused received the property in his possession; and (3) that the accused knew it was stolen. (*People* v. *Martin* (1973) 9 Cal.3d 687, 695 [108 Cal.Rptr. 809, 511 P.2d 1161], cert. den., 414 U.S. 1113 [38 L.Ed.2d 740, 94 S.Ct. 844].) The record more than amply supports appellant's conviction of receiving stolen property. There was no dispute that Hills' credit cards and checkbook were stolen and that appellant possessed them when he was arrested on March 19. Further, there was ample circumstantial evidence to support a finding that appellant knew the property was stolen. Possession of a stolen item in and of itself is a factor which would assist a reasonable person in formulating a strong suspicion that the recipient knew the item was stolen. (*People* v. *Martin, supra,* 9 Cal.3d at p. 696.) In light of the strong evidence of guilt, it cannot be said that the introduction of the identification testimony was prejudicial error.

Appellant was charged with and found guilty of robbery of Marcar. He contends that her in-court identification was based upon an impermissibly suggestive pretrial photographic lineup identification which thereby deprived him of due process. We disagree.

■ A violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; accord *People* v. *Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738]; *People* v. *Nation* (1980) 26 Cal.3d 169, 179 [161 Cal.Rptr. 299, 604 P.2d 1051].) Whether due process has been violated depends upon "the totality of the circumstances" surrounding the confrontation. (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]; *People* v. *Blair, supra,* 25 Cal.3d at p. 659.)

Four days after the robbery—May 20,—Marcar was shown a series of seven photographs. She selected three but identified appellant's picture as the closest to her recollection of the assailant. On June 4, Marcar was escorted through several courtrooms at the Hall of Justice and viewed 50 or 60 people, but did not make an identification. Appellant was arrested the next day.

"[A] photographic identification is sufficiently neutral where the persons in the photographs are similar in age, complexion, physical features and build (small differences in stature do not matter) [citations], and where the photograph of the accused does not stand out . . . ." (*People* v. *Holt* (1972) 28 Cal.App.3d 343, 350 [104 Cal.Rptr. 572], disapproved on another point in *Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 625, fn. 6 [114 Cal.Rptr. 121, 522 P.2d 681].) That was the situation here: appellant's photograph does not stand out. The trial court properly found that the photographic lineup was not unduly suggestive.

*Appellant was not denied the right to counsel at the photographic identification.*

■ Appellant contends that he was entitled to the presence of counsel at the photographic identification sessions with Hills, Middleton and Marcar. He was not. Neither the United States nor the California Supreme Courts have extended the constitutional right of counsel to photographic identification procedures. (*United States* v. *Ash* (1973) 413 U.S. 300, 321 [37 L.Ed.2d 619, 633, 93 S.Ct. 2568]; *People* v. *Lawrence* (1971) 4 Cal.3d 273, 279-280 [93 Cal.Rptr. 204, 481 P.2d 212]; *People* v. *Rist* (1976) 16 Cal.3d 211, 216-217 [127 Cal.Rptr. 457, 545 P.2d 833].)

*The trial court did not err in refusing appellant's request to inspect the prosecution's jury records.*

■ No error occurred when the trial court denied appellant's request for discovery of "any information" the prosecution had concerning the jury panel. The law at the time of the trial was that a criminal defendant had no right to such records. *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 766-767 [175 Cal.Rptr. 738, 631 P.2d 446], certiorari denied, 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280], decided more than six months after the trial in the instant case is prospective only.

*Instructions concerning lesser included offenses and reasonable doubt.*

■ The jury was instructed on lesser included offenses in accordance with CALJIC No. 17.10: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offenses charged, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish his guilt of such lesser offense beyond a reasonable doubt. [¶] The offense of robbery, violation of Section 211 of the Penal Code, necessarily includes the lesser and included offense of petty theft. The offense of grand theft, a violation of Section 487.1 of the Penal Code, necessarily includes the lesser included offense of petty theft.

The offense of attempted robbery, a violation of Section 664 [*sic*] of the Penal Code, necessarily includes the lesser offense of attempted petty theft."

Appellant requested the court to also instruct that: "Where the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense upon which the jury has been instructed, and if you entertain a reasonable doubt as to which offense has been committed, you must find the defendant guilty only of the lesser offense."

The court refused the instruction because it was "not the law" and because the matter was covered by other instructions. Appellant sees this as error on the basis of his reading of section 1097 and *People* v. *Dewberry* (1959) 51 Cal.2d 548 [334 P.2d 852]. We disagree. In giving CALJIC No. 17.10, the trial judge adhered precisely to *Dewberry* and section 1097 which that decision took pains to interpret.

Section 1097 provides: "When it appears that the defendant has committed a public offense, or attempted to commit a public offense, and there is reasonable ground of doubt in which of two or more degrees of the crime or attempted crime he is guilty, he can be convicted of the lowest of such degrees only."

In *Dewberry,* the Supreme Court held that the reference to "degrees" of an offense in section 1097 referred to all degrees of criminality that may be involved in a criminal act: "Section 1097 presupposes that the jury has concluded that the defendant is guilty of some public offense embraced within the pleadings but is in doubt as to the degree of the offense proved. The question presented is whether the words 'offense' and 'degrees' refer only to the specifically defined degrees of a single offense, or refer to all the degrees of criminality that may be involved in a criminal act. Thus, an unlawful killing may involve not only the two degrees of murder, but also the included offense of manslaughter. There is no reason for not applying the general principle of reasonable doubt to both situations. Given the overriding basic principle of reasonable doubt, the admonition that the Penal Code is to be interpreted 'with a view to effect its objects and to promote justice' (Pen. Code, § 4), and the anomaly that would otherwise result, *we conclude that the words 'offense' and 'degrees' in section 1097 refer to all the degrees of criminality involved in a criminal act.*" (51 Cal.2d at pp. 555-556; italics added.)[8]

---

[8]After enunciation of its holding, the *Dewberry* court emphasized that even if it were to narrowly construe section 1097 as referring to only "specifically defined degrees of single offenses divided into degrees, it would not follow that the instruction is erroneous." (*Id.,* at p. 556.) The court stated: "In every case the principle of reasonable doubt requires an acquittal of an offense when the prosecution has not met its burden of proof. Thus, whether reasonable doubt exists as between degrees of the same offense or as between the inclusive and included offense, the jury

*Dewberry* made clear that section 1097 correctly enunciated the definition of reasonable doubt not only in cases involving a choice between statutory degrees of a stated crime but also in all cases involving a choice between a principal offense and a lesser offense even though "degrees" were not set forth in the definition of either. The drafters of CALJIC, hardly oblivious to the *Dewberry* mandate, fashioned instructions which fit the situation where crimes are classified by statute into degrees (e.g., CALJIC No. 8.71: "Doubt Whether First or Second Degree Murder") and where lesser included offenses are involved. The latter instruction, CALJIC No. 17.10, in its annotations, specifically refers to *People* v. *Dewberry.*

The trial judge accurately assessed the additional requested instruction as redundant. It and CALJIC No. 17.10 both tell the jury that if they find that the prosecution has not proven the elements of robbery (the greater offense) beyond a reasonable doubt then the defendant may be found guilty of the lesser offense (petty theft) if that offense has been proven beyond a reasonable doubt.[9]

*The trial court did not err in refusing to instruct on diminished capacity.*

■ Appellant contends that the trial court erred in refusing its request to instruct on diminished capacity. (CALJIC No. 3.35.)

A trial court has no duty to instruct on diminished capacity where there is no substantial evidence to support such a defense. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 151 [125 Cal.Rptr. 745, 542 P.2d 1337].) Because appellant presented no substantial evidence of diminished capacity either by way

can only convict of the crime whose elements have been proved beyond a reasonable doubt. Narrowly construed, section 1097 at most illustrates the application of the rule in the case of crimes divided into degrees. It does not abrogate its application in other situations. [Citations.] Accordingly, under either interpretation, it affords no basis for departing from the settled law. [Citations.]" (*Ibid.*)

[9]We recognize that a contrary result was reached in *People* v. *Reeves* (1981) 123 Cal.App. 3d 65, 69-70 [176 Cal.Rptr. 182]. There, the jury was instructed on burglary and the lesser included offense of trespass, and the trial court gave CALJIC No. 17.10. On appeal the defendant contended that the trial court erred in failing to additionally instruct the jury, *sua sponte,* that if it entertained a reasonable doubt as to which of the two offenses was committed, it was to convict of the lesser offense only. Citing section 1097 and *People* v. *Dewberry,* the Court of Appeal agreed that "[s]uch is the law in California." (*People* v. *Reeves, supra,* 123 Cal.App.3d at p. 69.)

We have concluded that CALJIC No. 17.10 enunciates what *Reeves* finds that it does not: namely, that it instructs the jury that if it finds the prosecution has not sustained its burden of proving each element of the greater of the offenses beyond a reasonable doubt, but finds that the prosecution has sustained its burden of proving the elements of the lesser offense beyond a reasonable doubt, then it must return a guilty verdict of the lesser offense only. In light of our conclusion, the additional instruction mandated by *Reeves* is redundant, and we decline to adhere to that decision.

of evidence of intoxication or mental disease or defect, the instruction was properly refused.

*Trial counsel was competent.*

■ Appellant contends that he was denied the reasonably competent assistance at trial (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) in that his counsel failed to: (1) understand and utilize the concept of lesser included offenses; (2) adequately investigate and present a diminished capacity defense; and, (3) present evidence other than the testimony of appellant himself. Appellant fails to sustain his burden of proving inadequate trial assistance on each assignment of incompetency.

Appellant contends that trial counsel failed to understand the concept of lesser included offenses and concomitantly failed to plan his defense strategy. Although counsel initially failed to request instructions on lesser included offenses, the deficiency was remedied. Appropriate instructions on lesser included offenses were before the trier of fact. Appellant therefore has not shown that counsel's action or inaction "resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.)

Appellant next urges that trial counsel was incompetent for failing to adequately investigate a diminished capacity defense. Appellant does not pinpoint the date on which his capacity was allegedly diminished—March 16, 1980, or May 16, 1980, or both. He also fails to describe the type of diminished capacity which should have been investigated. Finally, he does not disclose which offense warranted a diminished capacity defense.

Appellant testified he had ingested heroin and cocaine on March 16, and codeine on May 16. The record does not reveal why defense counsel did not introduce evidence as to *how* this drug usage actually affected appellant's mental capacity. Nevertheless, it cannot be said that there is no satisfactory explanation for such inaction. Perhaps counsel's investigation revealed that he could not support such a defense. Where the record does not illuminate the basis for the challenged conduct, the claim of ineffective assistance of counsel is more appropriately made in a petition for writ of habeas corpus. (*People* v. *Pope, supra,* 23 Cal.3d at p. 426.)

Next, appellant asserts that counsel did not adequately investigate a defense of diminished capacity due to mental defect. The record shows that counsel's decision was an informed tactical choice.

Two days before trial, counsel received a psychiatric evaluation report pursuant to a court order. Therein, the psychiatrist stated that he had personally interviewed appellant and had consulted with appellant's treating psychiatrist. Based upon that information, the preliminary hearing, the arrest report, and a letter from defense counsel which set forth the facts of the case, the psychiatrist concluded: "I am not persuaded that this defendant on the basis of a mental illness lacked the capacity to harbor the specific intent to deprive the victims of their property. He does appear to be in need of ongoing psychiatric care and in addition there is some question as to whether he is in danger of resuming heroin use." Thus, the record strongly suggests that counsel's decision not to pursue a diminished capacity defense based upon mental illness was an informed tactical decision. If appellant can show that due to other facts counsel's strategy was unreasonable under the circumstances, his remedy is habeas corpus. (*People* v. *Pope, supra,* 23 Cal.3d at p. 426.)

*The trial court did not err in imposing the upper term.*

■■■ At the sentencing hearing, the court commented that there were no circumstances in mitigation and that the matters in aggravation were numerous. Specifically, the court found that: (1) the crime involved the threat of great bodily harm; (2) "the plan and sophistication of professionalism with which the crime was carried out indicates premeditation"; (3) his prior convictions were numerous and of increasing seriousness; and (4) he has served prior prison terms. Each of these are circumstances in aggravation as defined in California Rules of Court, rule 421.

Appellant contends that the court abused its discretion in failing to find mitigating circumstances. In particular he objects to the court's failure to find mitigation arising from a "mental or physical condition that significantly reduced his culpability for the crime." (Cal. Rules of Court, rule 423(b)(2).) The court did consider this factor but rejected it. No error occurred. (*People* v. *Jackson* (1980) 103 Cal.App.3d 635, 639 [163 Cal.Rptr. 115].)

■■■ Finally, appellant contends that the trial court used the same prior prison term, a 1973 conviction of robbery, to impose an enhancement pursuant to section 667.5, subdivision (b), and to establish as a factor in aggravation that he had served prior prison terms. (See Cal. Rules of Court, rule 421(b)(3).) The record supports this contention. Although the probation report lists other criminal convictions, the only one which led to a prison sentence was the 1973 conviction. A trial court may not use the same fact on which an enhancement is based to impose an aggravated term. (§ 1170, subd. (b); Cal. Rules of Court, rule 441(c); *People* v. *Lambeth* (1980) 112 Cal.App.3d 495, 497-499 [169 Cal.Rptr. 193].)

However, remand is not required. Aside from the lack of mitigating factors, the record amply supports the three other circumstances in aggravation. "A quantitative and *qualitative* analysis" of the factors in aggravation establishes that a remand would not benefit appellant. (*People* v. *Lambeth, supra,* 112 Cal.App.3d at p. 501, italics in original.)

The judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.