[No. F005550. Fifth Dist. Aug. 18, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD GENE PERKINS, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II-IV.

**COUNSEL**

Alan M. Caplan, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BEST, J.**—Defendant Donald Gene Perkins and Donald Carroll Pollard were convicted by jury of robbery in violation of Penal Code[1] section 211. The jury also found that Perkins was armed with a firearm within the meaning of section 12022, subdivision (a).

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

Perkins was sentenced to the upper term of five years on the robbery conviction, plus a one-year enhancement pursuant to section 12022, subdivision (a).

For reasons that follow, we affirm the judgment.

STATEMENT OF FACTS

A. *Motion to Suppress Identification*

On August 17, 1984, at approximately 5:30 p.m., two men robbed the Nunez Liquor store in Lamont. Maria Ramos was working in the store at the time and was two feet from the robbers during the incident. When a deputy sheriff arrived to investigate, Maria described the younger of the two robbers (later identified as defendant Perkins) as a White man in his late 30's, 5 feet 9 inches tall and 150 pounds. She indicated that he had brownish-blond hair and might have had blue eyes. Most significantly, she recalled that he had unsuccessfully tried to hide two lightning bolt tattoos on his neck with white powder. She described the other, older robber (later identified as Donald Pollard) as a White male, 6 feet and 165 pounds. She remembered that he wore a tan straw hat and black-framed glasses. The younger robber had entered the store first and asked Maria for some change from the cash register.

On August 22, 1984, Kern County Deputy Kirk Foster showed Maria a photographic lineup which had a photograph of Pollard. He explained that the lineup might or might not include a photograph of the robbery suspect. Maria was unable to make an identification.

On August 24, 1984, Deputy Foster drove Maria to the sheriff's office to view a physical lineup. He explained to her that the lineup might or might not include a robbery suspect. Prior to commencement of the lineups, Maria was instructed on the lineup procedures. She was told not to talk to anyone else during the lineup and to mark whether or not she identified anyone on a card after the lineup was completed.

The first lineup included defendant Perkins. Foster instructed all men in the lineup to put their collars up so that no tattoos would be visible. Maria recognized Perkins in the first position of the lineup and was scared, but she did not identify him on the lineup card. When Pollard appeared in the second lineup, she identified him without hesitation. The public defender who was present during the lineups left afterward.

Within one-half hour after the lineups were completed, Deputy Foster talked to Maria outside the lineup room. He had her sign a photocopy of

the photographic lineup she had viewed on August 22. He also asked her if she saw anyone closely resembling one of the robbers in the first live lineup. She replied that she had recognized one of the men (Perkins in position 1), but could not be sure until she saw the lightning bolt tattoo.[2] Foster told her that Perkins had the tattoo. She then said that she knew Perkins was the man who robbed her. Foster then showed Maria a photograph of a "shirttail relative" of Perkins, Glen Brimmage. She did not identify Brimmage as the robber.

Maria identified Perkins at the preliminary hearing. That was the first time she was able to view him with the lightning bolt tattoos visible.

B. *Trial*

At approximately 5:30 p.m. on August 17, 1984, Maria Ramos was a clerk at the Nunez Liquor store in Lamont. She was alone talking to her brother on the telephone when she saw a white car of Japanese manufacture, possibly a Toyota, drive slowly by the curb outside.

Less than two minutes later, defendant Perkins entered the store. He came to the counter and asked Maria for some change.

As Maria got Perkins's change, she noticed Pollard enter the store and approach her pointing a gun. Within seconds, Pollard was within two feet of Maria. She quickly complied with Perkins's command to hang up the phone, move away from the cash register and lie down. Perkins then took $318.08 from the cash register. Maria was too scared to hear the robbers leave. She did not move until her brother called back on the phone.

Later that day, Maria described both robbers to Kern County Deputy Sheriff McLaughlin. She described Perkins as a man in his late 30's with brownish-blond hair and lightning bolt tattoos on the left side of his neck which he had unsuccessfully tried to hide with a white substance. She thought he might possibly have blue eyes. She described Pollard as having black-rimmed glasses and a tan straw hat.

On August 22, 1984, Kern County Deputy Foster showed Maria some photographs, including one of Pollard. She did not identify either of the robbers. She described Perkins as the young man with light-colored hair.

---

[2] Maria testified that she differentiated between "recognizing" somebody she had seen before and identifying someone exactly. She was not "exactly sure" of Perkins's identity as one of the robbers until she saw the lightning bolts. Prior to the physical lineup, she had been instructed to only indicate that she "identified" someone.

She denied telling Deputy McLaughlin that Perkins had blue eyes. She explained that she had had little time to observe Pollard, but that he had black hair, black-framed glasses and a tan straw hat.

At approximately 10 p.m. on August 23, 1984, Bakersfield Policeman Brad Roark stopped Pollard's white Toyota. Both Pollard and Perkins were in the car with a woman named Belinda Killian.

On August 24, 1984, Deputy Foster drove Maria to the Kern County jail to view a physical lineup. He did not tell her that either of the robbers would be in the lineup.

Perkins was in the first position in the first lineup. Because he had lightning bolt tattoos on his neck, Foster had all the men in the lineup pull up their collars to obscure their necks. Foster did not want Maria's identification to be based solely on the tattoo.

When Maria saw the first lineup, she recognized the man in the first position (Perkins) as one of the robbers. Her recognition was based on a recollection of his appearance when she last saw him and the fact that seeing him again scared her. She made a distinction, however, between identifying a person and merely recognizing a person. Thus, because she could not see the lightning bolt tattoo on his neck, Maria did not identify him.

Maria then viewed a second physical lineup. She unhesitatingly identified the man in the first position, Pollard, as one of the robbers.

After the lineups, Deputy Foster asked Maria if anyone in the first lineup was similar to one of the robbers. Maria explained that she recognized "the first man" (Perkins), but was not certain without seeing whether he had lightning bolts tattooed on his neck. Foster told her that the man in the first position had lightning bolt tattoos. She replied that she could testify that the man was one of the two robbers.

Subsequently, Maria identified Perkins and Pollard at their preliminary hearings. She identified both of them again at another pretrial hearing. She was still afraid of them. Perkins's neck tattoo was visible at these hearings.

### DEFENSE

Both defendants claimed mistaken identification.

A social friend of Pollard, Debra York, testified that she visited Pollard at the Bakersfield Inn on August 17 just as the sun was setting. There were

a number of people there celebrating Pollard's birthday. When she left one-half hour later, it was dark. She also claimed that Pollard had been ill and inactive, but that he could walk and did not have difficulty lifting his arm. Finally, she opined that Pollard was a "good ol' boy," despite his extensive criminal record.

Pollard's stepdaughter, Aubrey Brimmage and her good friend, Connie Mead, both testified that they were with Pollard at the Bakersfield Inn on August 17 from approximately 3:15 p.m. until 11:30 p.m. They both testified he had been ill and relatively inactive. Both girls knew defendant Perkins. However, Mead had seen Perkins with Pollard, but Brimmage had not. Brimmage claimed that Pollard only owned gold glasses. However, when confronted with the brown-rimmed glasses that Pollard had in his pocket in court, she acknowledged that he owned brown ones as well. Neither girl had talked to the police.

Two deputy sheriffs, Mike Helton and Gregory Sturges, testified that they had seen lightning bolt tattoos on a total of 17-27 men during brief law enforcement careers. However, Perkins was the only man whom Helton had ever seen with such tattoos on the left side of his neck. Perkins's tattoos were the largest Sturges had ever seen.

Thomas Moore testified that he had tattooed lightning bolts on approximately 80 persons in the Bakersfield area since 1972 and had seen such tattoos on other customers.

## DISCUSSION

### I

*Perkins's motion to suppress the victim's in-court identification was properly denied.*

A. Defendant Perkins first contends that Deputy Foster's interview with Maria after she observed the lineup was so unnecessarily suggestive and conducive to irreparable mistaken identification that it resulted in unfairness sufficient to deprive him of due process of law. Not so.

Suggestive comments or conduct that single out certain suspects or otherwise focus a witness's attention on a certain person in a lineup can cause such unfairness so as to deprive a defendant of due process of law. (*People v. St. Germain* (1982) 138 Cal.App.3d 507, 519 [187 Cal.Rptr. 915].) However, the reviewing court must examine the "totality of the circum-

stances" in determining whether or not a lineup procedure has been unconstitutionally suggestive. (*Ibid.*)

"When the fairness of a confrontation is challenged, the burden is on the defendant to establish that the confrontation resulted in such unfairness that it infringed his right to due process." (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568 P.2d 376].) Defendant must show unfairness as a demonstrable reality, not just speculation. (*People* v. *Hernandez* (1970) 11 Cal.App.3d 481, 487-488 [89 Cal.Rptr. 766].)

This court must uphold the court's finding below if supported by substantial evidence, and all evidentiary conflicts must be resolved in favor of said findings. (*People* v. *Edwards* (1981) 126 Cal.App.3d 447, 455 [178 Cal.Rptr. 876]; *People* v. *Gomez* (1976) 63 Cal.App.3d 328, 336 [133 Cal.Rptr. 731].)

█ Perkins argues that Deputy Foster's conversation with Maria Ramos after the lineup in which she failed to identify him was "impermissibly suggestive." The record does not support this contention.

The record shows that Maria did recognize Perkins, but did not positively identify him because she could not see the distinctive lightning bolt tattoos on his neck. When she told Deputy Foster that she needed to see the tattoos, it was not impermissible for Foster to tell Maria that Perkins had such markings. (See, e.g., *People* v. *Pervoe* (1984) 161 Cal.App.3d 342, 357-358 [207 Cal.Rptr. 622]; *People* v. *Slutts* (1968) 259 Cal.App.2d 886, 889-890 [66 Cal.Rptr. 862].)

The identification in this case is similar to the one commended by the District of Columbia District Court in *Ash* v. *United States* (D.D.C. 1970) 313 F.Supp. 961, 965. The *Ash* court stated: "It is significant that Detective Evanoff did not add the goatee to petitioner's picture until after Martin picked that picture from the book. This procedure is not unduly suggestive simply because the police, in an effort to foreclose any possibility that the identifying witness may later say he made a mistake, add an important physical trait of the suspect at the time of the robbery *at the request of the witness* and after he has already selected a picture. Moreover, Martin's identification is all the more reliable because he asked for the drawing of the goatee. Although he was certain of his identification, he demonstrated that he was a discriminating witness in asking for the goatee. Martin's actions demonstrated his sincerity as well as the absence of suggestive procedures by the police. Obviously if all the pictures in the book had goatees on the individuals there could be no valid claim of error. And just as certainly there would be error if before the witness looked through the

book only the petitioner's photograph showed a goatee. Where, however, the procedure used falls between the above two extremes and the witness has already identified the suspect in accordance with permissible procedures this Court sees no reason why a more accurate picture than shown to the witness originally should be held impermissibly suggestive merely because it is used as a confirmatory tool. Such a procedure is analogous to showing the witness a more recent picture of the suspect after he has already selected one that was taken many years before when the suspect might have been thinner or heavier or younger. To hold the procedure in this case a violation of due process would be similar to holding impermissible a confirmatory line-up subsequent to the photographic identification where the suspect is presented in his then physical state rather than in his physical state of some years before. Indeed, the Court of Appeals has spoken of the possible desirability of confirmatory line-ups and no case has been cited by petitioner which indicates that the updating of a picture after it has been selected is a procedure in violation of petitioner's rights under the fifth amendment.'' (Fn. omitted.)

Deputy Foster cannot be faulted for asking Maria whether she had seen anyone in the Perkins lineup who ''closely resembled'' one of the robbers. Such a followup question did not indicate in any way that Perkins was a suspect. As such, the officer's actions were not improper and assured a reliable identification. Obviously, the fact that Maria recognized Perkins without the tattoos strengthened her subsequent identification. It is not impermissible or unduly suggestive for a police officer to question witnesses further if the officer believes the witnesses may actually recognize someone in the lineup. (See, e.g., *Garcia* v. *State* (Tex.Crim.App. 1978) 563 S.W.2d 925, 927-929; *Bellew* v. *Gunn* (N.D.Cal. 1976) 424 F.Supp. 31, 36; *Allen* v. *United States* (D.C.App. 1978) 383 A.2d 363, 367.) Furthermore, Foster's question was a logical one for an investigator to ask after the chief witness had apparently failed to identify a suspect. In order to continue the investigation and make certain he was on the right track, Foster needed to explore Maria's recollection and description of the robber. Obviously, such interviews between an investigator and a victim are not forbidden merely because the victim has failed to identify someone in a lineup.

To the extent that Foster's question conceivably conveyed some suggestiveness, it does not appear that it rose to the level of unconstitutionally tainting Maria's identification. No identification can be completely insulated from risk from suggestion. (*United States* v. *Cox* (7th Cir. 1970) 428 F.2d 683, 686.) In this case, it was sufficient that the jury could weigh the credibility of Maria's identification. (*In re Anthony T.* (1980) 112 Cal.App.3d 92, 97 [169 Cal.Rptr. 120].)

B. Secondly, Perkins contends his right to counsel was violated when Deputy Foster talked to Maria Ramos following the live lineup and after the public defender who was representing Perkins at the lineup had left. Relying on *People* v. *Williams* (1971) 3 Cal.3d 853 [92 Cal.Rptr. 6, 478 P.2d 942], Perkins argues that he was entitled to have counsel present when Maria identified him during the conversation with Deputy Foster which occurred outside the lineup room and after the lineups were completed.

In *Williams,* the defendant's attorney was present in the viewing room with the witness while the lineup was conducted. The witness was then taken outside the viewing room for the purpose of making his identification. Williams's counsel requested permission to be present and listen to any identification made by the witness. This request was denied as being against the policy of the sheriff's department. The Supreme Court held that under the circumstances of the particular case, *exclusion* of Williams's attorney from the actual identification violated Williams's right to have counsel present at the lineup. The court stated, however: "Our holding in this case should not be interpreted to create a requirement that defense counsel must be present whenever a witness whose testimony may be used as part of the prosecution's case at trial is interrogated. Such an interpretation of the decision would be an unwarranted assumption." (*People* v. *Williams, supra,* 3 Cal.3d at p. 857.) The court also stated, "We express no opinion on any case which may arise in a different factual setting." (*Ibid.*)

■ The instant case is distinguishable from the *Williams* case in that Perkins's attorney did not request to be present for any postlineup interviews. More significantly, however, is that the entire identification process had been completed. Maria had already marked her ballot indicating that she did not identify Perkins. (See, e.g., *United States* v. *Daniels* (3d Cir. 1974) 506 F.2d 791, 795-796; *Graham* v. *United States* (D.C.App. 1977) 377 A.2d 1138, 1140.) It would appear that at that point, since the identification process had been completed, Perkins's counsel had no more right to be present at the interview than he would at any nonconfrontational identification by a victim. (*People* v. *St. Germain, supra,* 138 Cal.App.3d 507, 520; see also *People* v. *Bustamante* (1981) 30 Cal.3d 88, 99, fn. 7 [177 Cal.Rptr. 576, 634 P.2d 927].) No defendant has the right to demand representation by counsel at every interview between the prosecution and its witness. (*United States* v. *Ash* (1973) 413 U.S. 300, 317 [37 L.Ed.2d 619, 630-631, 93 S.Ct. 2568]; *People* v. *Williams, supra,* 3 Cal.3d at p. 857; *People* v. *Adair* (1969) 2 Cal.App.3d 92, 96 [82 Cal.Rptr. 460].) Here, Perkins's counsel was able to effectively develop and cross-examine witnesses about the facts of Maria's identification. No more was required. (*Doss* v. *United States* (9th Cir. 1970) 431 F.2d 601, 603-604; *Bellew* v. *Gunn, supra,* 424 F.Supp. at pp. 36-38.)

II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Hanson (P. D.), Acting P. J., and Martin, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 25, 1986.

*See footnote, *ante*, page 583.