[No. B030587. Second Dist., Div. Six. Aug. 23, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY BARNES WATSON, Defendant and Appellant

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

COUNSEL

Steiner & Gerstein, Jonathan B. Steiner and Robert S. Gerstein for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Roy C. Preminger and Linda C. Johnson, Deputy Attorneys General for Plaintiff and Respondent.

## OPINION

**GILBERT, J.**—Gregory Barnes Watson was convicted by a jury of murder and assault with a deadly weapon. The jury also found true various enhancements.

Watson argues, among other things, that the prosecution did not exercise due diligence in trying to obtain the presence of a witness at trial, and therefore the court improperly permitted that witness's preliminary hearing testimony to be read to the jury. We disagree and affirm the conviction.

### FACTS

#### *The Prosecution's Case*

Marlen Gonzalez lived with her boyfriend, Jose Salinas, at the Simi Valley home of Hope Rodriguez. They were all home on the afternoon of November 10, 1986, when Watson came to see Rodriguez.

Gonzalez testified that Watson, Rodriguez and Salinas were in the dining room. She was in the kitchen preparing lunch when she heard a noise. She turned and saw Watson shooting Rodriguez. Watson then pointed the gun at the head of Gonzalez's young daughter. Gonzalez screamed, and Watson shot at her but missed. Watson fled out the door. At trial Gonzalez identified a grey sweatshirt with a red circular design as the one worn by Watson at the time of the shooting. The day after the shooting someone brought the sweatshirt to the cleaners.

Salinas testified at the preliminary hearing that Watson and Rodriguez were talking about money, and that Watson wrote something down on a piece of paper. Salinas left the dining room to go to the bathroom when he heard a shot. He turned and saw Watson shooting Rodriguez. Watson then shot Salinas twice, hitting him in the side and the throat. Salinas, despite his injuries, ran to his bedroom, got a revolver, and shot at Watson through a window as Watson ran to a yellow mini truck. Watson drove away and Salinas then called the police.

Later, while in a hospital emergency room, Salinas told police that a man named Greg, whom he had met before, was the assailant. (This was Watson.) The day after the shooting, Gonzalez also identified Watson as the gunman. A piece of paper with words on it written by Watson was found in the Rodriguez living room.

Marc Holmes, Watson's employer, testified under a grant of limited immunity as follows: Holmes, Rodriguez, Salinas and others attended a meeting at Rodriguez's home in late October 1986. Several of those attending were later arrested for possession of cocaine. Rodriguez was frightened after this drug arrest, and asked Holmes for his help in leaving the country. Holmes had planned to meet with Rodriguez early in the day of the shooting, but Salinas called him before lunch to postpone the time of the meeting. Sometime after 1 p.m. Rodriguez called Holmes and asked him for help in hiding her automobiles. A little while later, Watson called and told Holmes that he had driven by Rodriguez's house, and that it was surrounded by police. Holmes said he thought Rodriguez had been arrested for cocaine. Concerned that they might be vulnerable to arrest, Watson and Holmes met that afternoon and disposed of drug paraphernalia. Holmes provided police with the cleaner's ticket for the grey sweatshirt worn by the gunman.

Matthew Talbert, an acquaintance of Holmes and Watson, testified that Holmes told him that Watson admitted killing Rodriguez, and that Holmes and Watson disposed of the gun together.

## The Defense Case

Officer John Samarin of the Simi Valley Police Department was the first police officer at the scene. Samarin testified that he questioned Salinas and Gonzalez separately, and that they both described the assailant as a white male between twenty and thirty years old, five-foot six to seven inches tall, and slender build. Both Salinas and Gonzalez repeatedly told Samarin that they did not know the identity of the shooter. Gonzalez described him as clean shaven. In fact, Watson is six feet tall and wore a moustache at the time of the shootings.

Salinas did not tell Officer Samarin that he had a gun and fired back at the assailant. Gonzalez testified that she did not know the name of the gunman and did not remember she had previously met him until she spoke with Salinas on the day after the shootings.

Los Angeles Police Department Detective Ramon Madrid testified that several days before the shooting he took part in a drug raid where nine persons were arrested and ninety-five kilograms of cocaine seized. During the raid the detective found notes with Hope Rodriguez's telephone number.

Holmes denied telling Talbert that Watson admitted killing Rodriguez or that they disposed of the murder weapon together.

## Use of Salinas's Preliminary Hearing

### Testimony at Trial

Salinas did not testify at trial. The prosecution introduced into evidence the transcript of Salinas's preliminary hearing testimony. The trial court found that the prosecution sustained its burden of showing Salinas's unavailability by the introduction of the following evidence: Salinas was personally served with a subpoena to testify at trial, and he said at the time of service that he would appear. Salinas told Sergeant Patricia Hopkins of the Simi Valley Police Department that he was going home to Argentina for Christmas but that he would be back in time for trial. He gave the police the telephone numbers of a relative and a girlfriend in Argentina.

Detective Hopkins called Salinas in Argentina after Christmas to inform him that Watson had been released from jail on bail. Salinas confirmed he would testify, but he expressed fear of Watson.

Two weeks before trial, an investigator for the district attorney's office called Salinas in Argentina. This time, Salinas would not commit himself to

returning to testify because of his fear of Watson. During the first few days of trial, the investigator unsuccessfully tried to call Salinas several times in Argentina. When he finally reached Salinas, Salinas said he would not appear because his relatives feared for his safety.

When the trial began, the court issued a bench warrant for Salinas's arrest. The investigator again spoke to Salinas on the telephone and told him about the arrest warrant and warned him that if he failed to testify he would be subject to arrest were he to return to the United States. Salinas said he was not going to worry about the warrant, and again refused to testify.

A law clerk with the district attorney's office spoke with Paul Vaky, an attorney with the Latin American countries team, criminal division, of the International Affairs Office of the United States Justice Department. Vaky informed the district attorney's office that there is no way to compel Salinas's return from Argentina because there is no treaty between the United States and Argentina providing for extradition or compulsion of witnesses.

At trial the parties stipulated that Salinas had once married an American citizen and that he was a legal resident of the United States.

### DISCUSSION

### I.

■ Both the federal and state constitutions guarantee a criminal defendant the right to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People* v. *Louis* (1986) 42 Cal.3d 969, 982 [232 Cal.Rptr. 110, 728 P.2d 180].) "The primary purpose of the constitutional guarantee is to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [he] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' (*Mattox* v. *United States* (1895) 156 U.S. 237, 242-243 . . . .)" (*People* v. *Louis, supra,* 42 Cal.3d at p. 982.)

The right of confrontation is fundamental (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738]) and any denial or significant diminution of this right "calls into question the ultimate ' "integrity of the factfinding process" . . . ." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 309, 93 S.Ct. 1038].) Yet, the

right is not absolute. ■ A traditional exception to the confrontation requirement occurs when "a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318]; *People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515.) This exception must be narrowly construed, and only if necessity is demonstrated may the defendant's right of confrontation be overcome. (*People* v. *Louis, supra,* 42 Cal.3d at p. 983; *In re Montgomery* (1970) 2 Cal.3d 863, 867 [87 Cal.Rptr. 695, 471 P.2d 15].)

■ Thus, a prosecutor may offer the prior testimony of a witness against a criminal defendant only if he carries the burden of establishing 1) the unavailability of the witness and 2) the reliability of the testimony. (Pen. Code, § 686; Evid. Code, § 1291, subd. (a)(2).) A witness may be deemed "unavailable" if he is absent from the hearing and "the court is unable to compel his or her attendance by its process" or "the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(4), (5).) ■ In reviewing the trial court's determination of the un-availability of a witness, the appellate court exercises its independent judgment. (*People* v. *Louis, supra,* 42 Cal.3d at pp. 984-988.)

■ Watson argues that the People have not shown reasonable diligence. Because Salinas was a legal resident of the United States, he argues, the People should have obtained a federal subpoena pursuant to 28 United States Code section 1783.

28 United States Code section 1783 reads in relevant part: "(a) A court of the United States may order the issuance of a subpoena requiring the ap-pearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country . . . if the court finds that particular testimony . . . by him is necessary in the interest of justice . . . ."

Watson relies on *People* v. *St. Germain* (1982) 138 Cal.App.3d 507 [187 Cal.Rptr. 915]. In *St. Germain,* one of the victims of the charged crime was a Curacao national who was a legal, permanent resident of the United States. The victim testified at the preliminary hearing, but by the time of trial was living in Holland. Despite written and oral requests from the district attorney's office, the victim refused to return to the United States to testify at trial. (*Id.,* at pp. 515-516.) The trial court found the victim was unavailable as a witness and allowed the victim's preliminary hearing testi-mony entered into evidence at trial.

The Court of Appeal found the preliminary hearing transcript was inadmissible because the prosecution did not use the remedy offered by 28 United States Code section 1783, i.e., a subpoena issued by the federal courts requiring a United States resident in a foreign country to appear as a witness "before a 'body designated by it'—here the superior court jury . . . ." (*People* v. *St. Germain, supra,* 138 Cal.App.3d at p. 517.)

The *St. Germain* court explained that although "the subpoena in such a situation issues from the court of the United States rather than the superior court it is nevertheless within the definition of '*the* court's process' contained in Evidence Code section 240, subdivision (a)(5), just as is a subpoena issued by a sister state under the Uniform Act to Secure Attendance of Witnesses From Without a State in Criminal Proceedings. [Citations.]" (138 Cal.App.3d at p. 517; see also State v. *Aaron* (1987) 749 Wn.App. 735 [45 P.2d 1316 at fn. 5].)

The failure of the prosecution to attempt to secure Salinas's presence by use of the federal subpoena does not require reversal here. In *St. Germain,* the federal subpoena was the "*sine qua non* completely missing from the proof . . ." for establishing reasonable diligence in attempting to obtain the presence of a permanent "resident of the United States." (*People* v. *St. Germain, supra,* 138 Cal.App.3d at p. 517.) A federal subpoena, however, is not the sine qua non for all cases, and particularly those where the witness has been served with a valid state subpoena.

Here, Salinas was served in California with a valid state subpoena requiring his attendance at trial. The investigator informed him that a subpoena had been issued for his arrest and that his failure to testify could subject him to arrest if he returned to the United States at a later date. The victim in *St. Germain* had not been served with any subpoena requiring him to appear at trial. Once he was in a foreign country, a federal subpoena was necessary to establish reasonable diligence.

*In re Terry* (1971) 4 Cal.3d 911 [95 Cal.Rptr. 31, 484 P.2d 1375], cited by Watson, is also distinguishable. In *Terry,* the prosecution attempted to obtain the testimony of two minors for a criminal trial in California. Subpoenas were served on the boys' father a few days before trial when he happened to be in Los Angeles with the boys. The case was ultimately continued a few times to a new trial date. The prosecution then received new subpoenas for the boys to appear for the new trial date, but made no attempt to serve them.

Our Supreme Court held it was error to permit the children's preliminary hearing testimony to be read at defendant Terry's trial because it did "not

appear that the prosecuting authorities made any attempt to use the Uniform Act or to persuade the father to bring the children to California to testify." (4 Cal.3d at p. 931.) Here, unlike the situation in *Terry,* the witness was properly served with a subpoena in California which required him to appear for trial on the date the case actually went to trial. The witness was also warned of the sanctions he could face if he failed to testify.

In *People* v. *Masters* (1982) 134 Cal.App.3d 509 [185 Cal.Rptr. 134], the prosecution in California attempted to obtain the presence of a witness residing out-of-state by serving her with a subpoena in Arkansas. She had been served in Arkansas rather than California. Therefore, the subpoena had no legal effect and no sanctions could be applied to compel her attendance in California. Although the prosecution kept in touch with the witness and made numerous telephone calls to her in an attempt to persuade her to come to California at the state's expense, this was not enough to establish reasonable diligence. Reasonable diligence in *Masters* could not be shown absent serving the witness under the Uniform Act.

Watson ties the question of diligence to the sanctions that can result from failure to obey the federal subpoena. These sanctions include the imposition of a fine of up to $100,000 for failure to appear (28 U.S.C. § 1784). This fine may be satisfied by seizure and sale of assets. The failure to obey the federal subpoena could also jeopardize the status of a resident alien. Salinas was a resident alien and had also worked as a caterer during most of his 14 years in the United States, and at the time of the crime owned a catering business which he was expanding in the Simi Valley area. Therefore, Watson makes a persuasive argument that the sanctions available for failure to honor the federal subpoena could provide a strong incentive for Salinas to return and testify.

The same argument, however, can be made for failure to obey a state subpoena which can result in arrest. There is no such sanction for failure to obey the federal subpoena under discussion here. For some people, the threat of arrest is a more powerful incentive to appear than is the loss of assets. An arrest results in a loss of freedom and can also jeopardize the status of a resident alien.

There may be an even more powerful incentive not to appear despite the threat of either arrest or loss of assets—the threat to one's safety.

Whether the service of a federal subpoena in this case would have been helpful is speculation at best. The prosecution served Salinas with a state court subpoena under circumstances where it had every reason to believe he would be available to testify. The prosecution made additional efforts to

secure Salinas's attendance. This is sufficient to meet the reasonable diligence test.

## II.-IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment of conviction is affirmed.

Stone (S. J.), P. J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 15, 1989.

---

* See footnote, *ante*, page 446.